[No. F003934. Fifth Dist. Sept. 19, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
RAMIRO RUIZ GONZALES, Defendant and Appellant.

**[Opinion certified for partial publication.‡]**

‡Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication
with the exception of the "FACTS" and parts I, II, III, IV, V and VII.

592

**COUNSEL**

Charles M. Bonneau, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Jane N. Kirkland and Edmund D. McMurray, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

MARTIN, J.—Defendant, Ramiro Ruiz Gonzales, was charged with two counts of murder (Pen. Code, § 187)[1] and one count of robbery. In connection with the murders, the district attorney further alleged the special circumstances of robbery (§ 190.2, subd. (a)(17)(i)) and double murder (§ 190.2, subd. (a)(3)). The trial court denied defendant's section 995 motion, motion to strike testimony from the preliminary hearing transcript, motion to suppress incriminating statements made to a Monrovia, California, police officer and motion for a psychiatric examination of prosecution witness Teresa F., a minor.

After trial, the jury found defendant guilty of two counts of first degree murder and one count of robbery. The trial court denied defendant probation and referred him to the California Youth Authority (CYA) for an evaluation and report. Upon defendant's return from CYA, the court conducted a hearing on the supplemental report of the probation officer and re-referred defendant to CYA for further consideration of his amenability to treatment and rehabilitation. Upon defendant's return from CYA with a supplemental report, the court sentenced defendant to state prison for two consecutive terms of twenty-five years to life with appropriate time credits. Defendant filed a timely notice of appeal.

### FACTS*

. . . . . . . . . . . . . . . . . . . . . . . . . .

### I.-V.*

. . . . . . . . . . . . . . . . . . . . . . . . . .

### VI. DID THE TRIAL COURT PROPERLY RE-REFER DEFENDANT TO CYA FOR REEVALUATION FOLLOWING A CYA RECOMMENDATION OF HIS AMENABILITY TO CYA TREATMENT?

After conviction on all counts, the probation office recommended defendant be referred to CYA pursuant to Welfare and Institutions Code section 707.2 for a determination of his amenability to treatment. On August 12, 1983, CYA filed a determination finding defendant amenable to the treatment and training offered by CYA. Thereafter, the People filed points and authorities regarding sentencing choice and urged defendant be sentenced to state prison. On August 31, 1983, the Kern County probation office filed

[1]All statutory references are to the Penal Code unless otherwise indicated.
*See footnote, *ante,* page 591.

a supplemental report disagreeing with the CYA finding of amenability and recommending two consecutive prison sentences for the two first degree murder counts. On that same date, the court commenced hearing on the supplemental report of the probation officer. The prosecutor argued CYA officials had not considered defendant's behavior and amenability to treatment at Kern County Juvenile Hall and sought resubmission of the matter to CYA with these additional facts. He noted there was a split of opinion among the CYA staff members and one CYA staff psychologist believed defendant was unamenable to treatment and would do well in a prison setting.

The court heard the testimony of a number of Kern County Juvenile Hall group and supervising counselors and then re-referred the matter to CYA for further consideration of defendant's amenability to treatment and re-habilitation. On March 5, 1984, the CYA filed another amenability deter-mination and noted defendant was "more criminally oriented in his value system than the prior assessment indicated." The CYA concluded defendant was not amenable to the treatment and training offered by CYA. On March 30, 1984, the Kern County probation office filed a supplemental report agreeing with the CYA's most recent finding and recommending a prison sentence of two consecutive life terms for the two counts of first degree murder. The trial court held a sentencing hearing on the same date, evaluated and considered both CYA reports and concluded defendant was not amenable to treatment at CYA. The court sentenced defendant to two consecutive 25-year-to-life terms on the murder counts.

Defendant contends on appeal the trial court's re-referral of the matter to CYA was an implied rejection of the initial CYA recommendation and violated established law regarding the weight to be given CYA recommen-dations.

Welfare and Institutions Code section 707.2 states: "Prior to sentence, the court of criminal jurisdiction may remand the minor to the custody of the Youth Authority for not to exceed 90 days for the purpose of evaluation and report concerning his amenability to training and treatment offered by the Youth Authority. No minor who was under the age of 18 years when he committed any criminal offense and who has been found not a fit and proper subject to be dealt with under the juvenile court law shall be sentenced to the state prison unless he has first been remanded to the custody of the Youth Authority for evaluation and report pursuant to this section.

"The need to protect society, the nature and seriousness of the offense, the interests of justice, the suitability of the minor to the training and treatment offered by the Youth Authority, and the needs of the minor shall

be the primary considerations in the court's determination of the appropriate disposition for the minor."

■ A person is amenable to CYA training and treatment if he can be materially benefited. A person will be materially benefited when there is a reasonable possibility his likelihood to commit criminal behavior can be significantly reduced or eliminated within the available confinement and jurisdiction time. These factors are considered in determining whether a person will be materially benefited: (1) Does the person have the capacity to change? (2) Is the person's criminal behavior so firmly established there is little likelihood it can be changed by CYA commitment? A person will also be materially benefited when there is a reasonable possibility his criminal behavior would be exacerbated more by the other disposition alternatives available to the court when compared with disposition alternatives available to the CYA. (Welf. & Inst. Code, § 1731.5; Cal. Admin. Code, tit. 15, §§ 4157, 4168.)

■ The CYA's recommendation under Welfare and Institutions Code section 707.2 is entitled to great weight and ordinarily should be followed absent substantial countervailing factors. The seriousness of defendant's conduct, of itself, does not ordinarily constitute legally sufficient grounds to reject a CYA recommendation under Welfare and Institutions Code section 707.2. (*People* v. *Carl B*. (1979) 24 Cal.3d 212, 214-215, 219 [155 Cal.Rptr. 189, 594 P.2d 14].) However, Welfare and Institutions Code section 707.2 does not remove sentencing discretion from the trial court and vest it in CYA. Specifically, the code section does not direct the court to follow the CYA recommendation nor does it preclude the trial court from considering a probation report. (*People* v. *Taylor* (1978) 81 Cal.App.3d 973, 976 [146 Cal.Rptr. 821].) Sentencing discretion, however, is not unlimited; substantial evidence must support the trial court's finding of an appellant's unamenability or unsuitability to training and treatment offered by CYA. (*People* v. *Carl B., supra,* 24 Cal.3d at p. 218.)

Defendant contends: "The Supreme Court has held that Youth Authority recommendations under section 707.2 are entitled to great weight and a recommendation of suitability should not be rejected absent a showing that the defendant is unsuitable for the Youth Authority. There was no showing of neglect or surprise in the preparation of the first recommendation. Consequently, the re-evaluation was without foundation and created judicial pressure to change the recommendation, which was in fact the action taken by the Youth Authority. Appellant has been denied a fair determination of his Youth Authority suitability. He should be remanded to the trial court for a new commitment hearing based on the initial Youth Authority evaluation of August 12, 1983."

Defendant essentially contends the court could not refer him to CYA for a second diagnostic evaluation absent statutory authority. A review of the Welfare and Institutions Code does not reveal any express authority permitting or precluding a re-referral. ■ However, the leading cases of the California Supreme Court would seem to permit such a procedure. If a court may reject a CYA amenability determination upon a finding of substantial countervailing considerations, then a fortiori, the court should be able to re-refer a defendant to CYA to verify or negate the existence of such considerations. This is especially true where, as in the instant case, substantial countervailing considerations were presented to the sentencing court after receipt of the initial CYA report finding amenability.

In the original amenability determination filed August 12, 1983, the CYA concluded: ". . . [T]here is a reasonable possibility that the defendant's likelihood to commit criminal behavior can be significantly reduced or eliminated within the confinement time and jurisdiction time available.

"Clinical evaluation indicates that the defendant has not demonstrated, during his stay at the clinic, a demeanor that would indicate he is more criminally sophisticated and criminally oriented than our normal population. Clinical evaluations tend to indicate that he is still somewhat immature in some of his personality characteristics. It would appear that if the defendant was placed with older and more sophisticated, criminally oriented peers, that this could in fact solidify criminally oriented values.

"In view of the above, there is a reasonable possibility that the defendant's criminal behavior would be exacerbated more by the other alternative dispositions available to the Court." A CYA parole agent who interviewed defendant in conjunction with the determination concluded he had the capacity for change and was not considered "intractable." A staff psychologist who interviewed defendant concluded he fit a classic pattern of antisocial personality disorder and stated his "prognosis for rehabilitation is poor." The psychologist predicted heavy gang affiliation for defendant and stated he would be a high security risk. The staff psychiatrist who evaluated defendant concluded, "There are no distinct psychiatric features in this case which appear to have any relevance to an evaluation of this youth's amenability to CYA programming. Any decisions regarding disposition can best be made from a consideration of his behavioral and social history." Thus, while CYA initially found defendant amenable to treatment, such finding was equivocal at best.

At the August 31 hearing on this report, the prosecution called a number of witnesses to testify concerning defendant's conduct in Kern County

Juvenile Hall. Gary Boleschka testified he was assistant director of Kern County Juvenile Hall. Boleschka conducted an office conference with defendant to "come up with basically a game plan on how we were going to deal with him and his adjustment in our program." Defendant became very upset and juvenile hall authorities had to terminate the interview, place him in restraints, and remove him to his living unit. Boleschka said a juvenile admitted to the hall is assigned one of five security levels based on the minor's sophistication and the crime charged. Level 1 is minimum security. In level 5, the juvenile hall adjusts its program to try to meet the needs of the particular individual. Defendant was assigned to level 5 from the day he was booked into Kern County Juvenile Hall. Boleschka concluded defendant was "one of the most sophisticated individuals I have seen in the system, and I think he is totally unamenable and was totally unamenable to our program." Defendant had a limited capability of working out problems and was very aggressive and defiant toward authority. Boleschka believed defendant would have an extremely difficult time handling any physical setting similar to that of the Kern County Juvenile Hall.

Hans Bothe testified he was a group counselor at the Kern County Juvenile Hall. Bothe conducted counseling sessions with defendant in the fall and winter of 1982. Bothe said defendant had no problem following rules as long as they did not contradict what he wanted to do. However, if defendant felt the rules were hindering him, defendant would be "pushing the limits, trying to get around, to bend them . . . ." Defendant frequently showed a poor attitude and yelled, screamed, and used obscene language when disciplined. Bothe never saw any change in defendant's behavior while defendant was detained in his unit. Bothe described an incident on September 22, 1982, in which defendant was caught wearing a towel around the head. When Bothe told defendant to remove the towel, defendant refused. Bothe then placed defendant on administrative restriction and defendant pleaded with, yelled at and threatened Bothe. A short time later defendant's attitude deteriorated and he kicked the door to his room and began yelling.

David D. Sams testified he was case work supervisor at the CYA northern reception center and clinic. Sams compiled defendant's amenability determination report and acknowledged he was a moving force in reference to the final conclusion. Sams was unaware of specific incidents of defendant's conduct at Kern County Juvenile Hall when he compiled the amenability determination. The Kern County probation officer's report to the court indicated the defendant had difficulties in juvenile hall. However, the CYA staff did not have juvenile hall incident reports available at the time they reviewed defendant's case. Sams testified the incident reports regarding defendant's conduct and attitude at juvenile hall "could be important based upon the frequency, the duration, the type and things of that nature. It would be new information we did not have previous, along those specific

dimensions." *Sams admitted the CYA had conducted reevaluations of juveniles based on new information.* He also agreed information about defendant's gang involvement in Los Angeles could also be important. He did not recall information concerning the intensity, the depth, or quality of defendant's gang involvement.

Ruben Molina testified he was a group counselor at Kern County Juvenile Hall. Defendant was assigned to his counseling unit for at least five months. Molina experienced one major problem with defendant. When defendant was placed on restriction and got out of hand, staff members were forced to enter his room and physically restrain him. Molina described defendant's conduct as "irrational. He seemed to have—he was violent. He did have a comb in his hand. He had it, was carrying it in a striking manner, close to his body. He didn't respond to any verbal communications that we were giving him to calm down, or anything." Molina described defendant's loss of control as "pretty drastic . . . the worst I had seen." Defendant did not accept authority figures, did not like discipline, and would react to even minor discipline in a negative manner. He consistently disobeyed minor and major rules. On one occasion he destroyed his bedding and clothing. On another occasion he carved some names into the wall of his room.

Richard D. Faidley testified he was a group counselor at juvenile hall at the time of defendant's detention. Faidley saw defendant "out of control a lot" when defendant was in stressful situations. On one occasion, Faidley confiscated some material from defendant's room and told defendant the material would not be returned to him. Defendant tore his room apart and beat the door in. Four staff members had to enter the room and restrain him. Faidley testified defendant did not make any progress in adjusting himself to the juvenile hall program. Faidley said: "If there was any progress I would say it was regression more than progress. The longer he was there the worst [*sic*] his behavior became."

Ruben Navejas testified he was a group counselor at Kern County Juvenile Hall and defendant was in his counseling unit during November 1982. Navejas testified defendant was sophisticated for his age, "knew the program," and knew exactly what was expected of him. Navejas felt defendant's sophistication created attitude problems. He observed defendant lose control of his behavior on one occasion. During an evaluation conference with Gary Boleschka and Arturo M. Valdes, defendant began losing control and Boleschka terminated the conference. Defendant became angry on leaving the conference room and slammed the door in an aggressive manner. Navejas had to restrain defendant because he was visibly disturbed and had his fists clenched. Navejas considered defendant a manipulative individual.

Dennis A. Travers testified he was a supervising counselor at Kern County Juvenile Hall in 1982. Travers said defendant adjusted poorly to the programs at juvenile hall. He did not fit in with the normal population detainees at the hall. Defendant was assigned to security level 4-5, the highest security level within the institution. Defendant had an attitude problem because he opposed authority and did not respond to the staff's instructions. Travers did not see any progress in defendant's attitude or adjustment and noted no improvement in defendant's adjustment over time. Travers described defendant as a sophisticated individual who evidenced a sophistication "through manipulation with other wards as with other detainees as well as with staff. Attempting to use himself or his influence with them for certain things he wanted, certain privileges." On September 2, 1982, Travers restricted defendant to his room for defacing county property. Defendant went out of control and four staff members were required to use force to restrain him. They obtained a mattress, took defendant down, and placed him in restraints.

Arturo M. Valdes testified he was a supervising counselor at Kern County Juvenile Hall. In 1982, Valdes supervised the receiving and adjustment unit and the open program unit within the juvenile hall. Valdes testified juvenile hall staff placed defendant into the open program unit one day after he arrived in juvenile hall. There the defendant became a discipline problem and it was necessary to transfer him back to the adjustment unit. During defendant's first four months in juvenile hall, he functioned in a secure setting because of his offense and his sophistication level. Following that time, "it was a downward trend, and it was very difficult to ascertain that he would be able to function in the total population." Valdes testified defendant would become irrational when he could not get his way. He described defendant's behavior as "a demanding, lashing out type of thing where he wanted to have his way regardless." Defendant seemed street-wise and knowledgeable about institutional life. Valdes described defendant as "very sophisticated." Valdes was present at defendant's November 19, 1982, conference with Gary Boleschka. Five minutes into the session, defendant became irrational, started trembling and crying, and started losing control of himself. As defendant left the conference, he became upset and violent and slammed the door. When defendant began clenching his fists, staff members took physical control of him.

Based on the foregoing testimony, the court re-referred the matter to the CYA for further consideration of defendant's amenability to treatment and rehabilitation. In our view, the testimony elicited at the August 31, 1983, sentencing hearing, which was not made available to the CYA for consideration in its initial report, constituted substantial evidence of countervailing considerations to overcome the initial CYA recommendation. The evidence

amply justified the trial court's conclusion that re-referral of defendant to CYA for further evaluation and amenability determination was warranted.

On March 5, 1984, the CYA filed a second amenability determination. The CYA report concluded defendant did have the capacity to change. However, "the preponderance of current information points to this defendant's not being able to materially benefit from the [CYA] within the confinement time and jurisdiction time available to the degree that there is a reasonable possibility that his likelihood to commit criminal behavior can be significantly reduced or eliminated." Based on the new information, the CYA found defendant not amenable to treatment because (1) the defendant was more criminally oriented in his value system than the prior assessment indicated and (2) there was a reasonable possibility the defendant's criminal behavior would not be exacerbated more by other disposition alternatives available to the court. The record before us supports the trial court's ultimate conclusion defendant was not amenable to the treatment and training offered by CYA and defendant does not effectively dispute this conclusion.

### VII. Did the Trial Court Properly Sentence Defendant to Two Consecutive Terms for the Multiple Murders?*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

The judgment is affirmed.

Hanson (P. D.), Acting P. J., and Best, J., concurred.

---

*See footnote, *ante,* page 591.