493 N.W.2d 680 (1992)
In the Interest of M.D.N., a child.
Les WITKOWSKI, Petitioner and Appellee,
v.
M.D.N., a Child; Merle Sherman, Uncle; and Child's Guardian Ad Litem, William D. Schmidt, Attorney at Law, Respondents and Appellants.
Cr. No. 920121.
Supreme Court of North Dakota.
December 14, 1992.
*681 Bruce B. Haskell and Paul C. Seado, Asst. State's Attys., Bismarck, for petitioner and appellee; argued by Bruce B. Haskell.
Rodney K. Feldner, Mandan, for respondents and appellants.
William D. Schmidt, Guardian Ad Litem, Bismarck.
VANDE WALLE, Justice.
M.D.N. appealed from a juvenile court order transferring from the Juvenile Court of Burleigh County to the District Court of Burleigh County, jurisdiction of the prosecution of four charged offenses of Murder, each count a AA Felony. We affirm.
On January 31, 1992, a petition was filed with the Juvenile Court of Burleigh County which alleged that M.D.N. was a delinquent child because, on or about January 26 or 27, 1992, M.D.N. committed four acts classified as AA Felony Murder pursuant to section 12.1-16-01, NDCC. The victims were M.D.N.'s mother, father, brother, and sister. M.D.N. was 15 years old when the alleged murders occurred and when the petition was filed.
On the same day the petition was filed, the Burleigh County State's Attorney's Office filed a "Motion to Transfer," requesting the transfer of jurisdiction to the Burleigh County Court pursuant to section 27-20-34, NDCC.[1]
*682 A hearing on the petition was held in the Juvenile Court of Burleigh County. After consideration of the evidence and testimony presented and making its findings of fact, the court ordered jurisdiction of the offenses transferred to the District Court of Burleigh County in order that M.D.N. be tried as an adult on the charges that he committed those offenses.
On appeal, M.D.N. contends that the transfer to adult court was in error as the State failed to prove that there was a definite probability, or substantial evidence to support a finding, that M.D.N. was not amenable to treatment or rehabilitation as a juvenile through available facilities as required for transfer under section 27-20-34, NDCC.[2]See f.n. 1.
Crimes committed by juveniles may be equally as harmful as those committed by adults, but it has long been recognized that juveniles and adults do not share equal responsibility for their offenses. Perhaps this stems from the theory that crime among juveniles is not exclusively the juvenile's faultoffenses by the juvenile may represent a failure of the school, the family, and the social system, all which share the responsibility for their development. From this basic concept, the North Dakota Legislature has established a separate judicial procedure for juveniles which incorporates the view that juveniles are less culpable than adults; have less judgment, character or fully-formed identities than adults; and are more apt to change their ways than adults. Indeed, our juvenile justice system was envisioned to be a humane process of rehabilitating wayward youths rather than merely punishing them. NDCC § 27-20-01.
Whether violent young offenders should be tried and, if found guilty, should be sentenced as juveniles or as adults poses difficult practical and theoretical problems. Relinquishing juvenile court jurisdiction over young offenders to an adult criminal court represents a choice between sentencing in rehabilitative juvenile courts or sentencing in essentially punitive adult criminal courts. Conceptually, rehabilitation and punishment may be mutually exclusive penal goals. But see NDCC § 12-47-01 [penitentiary is for punishment and "reformation" of offenders]. Punishment is retrospective and imposes harsh consequences for past offenses. It has a goal of proportional punishment which accords great significance to the seriousness of the offense. Rehabilitation, however, is prospective and tries to improve the offender's future welfare. Rehabilitation assigns primary importance to the individual as its sentences are nonproportional and indeterminate.
But punishment and rehabilitation are not the only concern. In recent years, society *683 has demanded more incarcerations of criminals, and many states have responded by diluting the rehabilitative philosophy of juvenile court. It is difficult to embrace a rehabilitative stance toward juveniles who have committed particularly heinous or serious violent crimes which provoke strong emotions and fear for safety of the public. It is not surprising to find that with the initial adoption of a juvenile justice system in North Dakota in 1911, a provision was enacted which allowed a juvenile to be tried and punished in adult criminal court. S.L.1911, ch. 177, § 11, codified at NDCC § 27-16-13, repealed by S.L.1969, ch. 289, § 4.
With limited exceptions, the juvenile courts of North Dakota have exclusive jurisdiction over those accused persons under the age of eighteen regardless of the seriousness of the charge. NDCC §§ 27-20-02(1), 27-20-03. Although this objective qualification is helpful to the juvenile court in determining a waiver of jurisdiction, the boundaries of childhood itself are at best artificial, and waiver involves the appropriate disposition of offenders who only chronologically happen to be juveniles. Varying definitions of the end of childhood are applied for different purposes, for example, the right to vote [age eighteen, NDCC § 16.1-01-04(1)], to marry without parental consent [age eighteen, NDCC § 14-03-02], to drive an automobile without a parent [age sixteen, NDCC § 39-06-03(1)], and to purchase alcohol [age twenty-one, NDCC §§ 5-01-08, 5-01-09]. The authority of a juvenile judge to transfer a minor to adult court implies that despite the explicit age jurisdiction and various "states of readiness" as inherent in the above statutes, society has acknowledged that certain actions taken by juveniles may signal an end to childhood. As a result, the allowances made for the juvenile's lesser moral and social development will no longer be tolerated or accepted.[3]
Trying a juvenile as an adult is a severe sanction with harsh consequences. The status of "juvenile" carries a shield from publicity, protection against extended pretrial detention and post-conviction incarceration with adults, and guarantees that confinement will not extend beyond the age of twenty. NDCC § 27-20-36(6). In addition, status as a juvenile provides protection against loss of civil rights, against disqualification for public employment, and against the personal status degradation and restriction of legitimate opportunities that often follow a criminal conviction. There are also studies which indicate that youths treated as adults have a greatly reduced probability of surviving adolescence with their life chances intact.[4] Accordingly, a transfer of jurisdiction of a juvenile's offenses to adult court involves more than just a choice of forum  it involves a choice of jurisprudential philosophy that governs the nature and purpose of the proceeding, the severity of the punishment, and the long-term effect on the youth.
Our review under the Uniform Juvenile Court Act,[5] Chapter 27-20, NDCC, is based "upon the files, records, and minutes or transcript of the evidence of the juvenile court, giving appreciable weight to the findings of the juvenile court." NDCC § 27-20-56(1); Eastburn v. J.K.H., 392 N.W.2d 406 (N.D.1986). We reexamine the evidence in a manner similar to the former *684 procedure of trial de novo. In Interest of J.K.S., 321 N.W.2d 491 (N.D.1982); In Interest of M.D.J., 285 N.W.2d 558 (N.D.1979).
The Legislature has set forth a "reasonable grounds" standard for waiver of juvenile court jurisdiction and transfer of juveniles to adult court in section 27-20-34(1)(b)(4), NDCC. The standard of reasonable grounds has been compared to a showing of probable cause. Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); In Interest of A.D.L., 301 N.W.2d 380 (N.D.1981).[6] Probable cause is a minimal burden of proof. It is generally employed in the judicial decision-making process when the effect of the determination has temporary or short-term consequences. Healy v. Healy, 397 N.W.2d 71 (N.D.1986). We have held that if it appears to be so or there is a definite probability based on substantial evidence, the standard of probable cause has been met. Woehlhoff v. State, 487 N.W.2d 16 (N.D.1992); In Interest of R.R., 305 N.W.2d 38 (N.D.1981) citing State v. Persons, 201 N.W.2d 895 (N.D.1972). Therefore, a waiver-of-jurisdiction hearing is decided upon whether or not there is probable cause, "reasonable grounds", that the factors listed in section 27-20-34(1)(b)(4), NDCC, are met. The State bears the burden of persuasion on these issues. A.D.L., supra.[7]
The factors necessary to transfer jurisdiction are both subjective and objective. Objective considerations include the age of the youth, section 27-20-02(1), NDCC. North Dakota, as do most other states, looks to the subjective elements "amenability to treatment," and "interests of the community."[8]
We cannot, however, ignore another objective considerationthe seriousness of the offense. We have observed that section 27-20-34(1), NDCC, does not require that the nature and severity of the offense must be taken into consideration at the transfer hearing to determine if treatment and rehabilitation as a juvenile can be accomplished through available facilities or if the interests of the community require that the child be placed under legal restraints or discipline. In Interest of P.W.N., 301 N.W.2d 636 (N.D.1981). We nonetheless have held that the nature and severity of the offense must be given some consideration. Id. Experience tells us that a youth committing a heinous and serious crime requires a course of treatment different than the treatment accorded a youth who commits a nonviolent offense. Id. Similarly, we have held that the interests of the community as well as the legal restraint and discipline needed will vary depending upon the nature of the offense. Id.; R.R., supra; A.D.L., supra. Other states which have adopted the Act have reached a similar conclusion. See Commonwealth v. Rush, 522 Pa. 379, 562 A.2d 285, 288 (1989) ["In light of the severity of the crimes committed ... we find no error in the court's decision to transfer this matter to the adult court system."].
Notwithstanding that we must give some consideration to the nature and severity of *685 the offense in determining amenability to treatment, that factor remains one of the most subjective and discretionary factors which juvenile judges must grapple with in determining whether a transfer is appropriate. That factor is the subject of this appealwhether "[t]he child is not amenable to treatment or rehabilitation as a juvenile through available programs." NDCC § 27-20-34(1)(b)(4)(b). Some juveniles are more amenable to treatment than others, so treatment has a markedly different effect depending on the individual juvenile. Consistent research findings demonstrate that rehabilitative treatment programs tend to make juveniles not amenable to treatment ("nonamenables") commit more crimes than they would have committed without treatment.[9] Another study found that low-risk offenders placed in institutions had higher re-incarceration rates than similar low-risk offenders who were placed in halfway houses. Length of incarceration also affected the risk of recidivism, so that if courts fail to divert low-risk inmates from continued imprisonment the risk for future recidivism may actually increase. See f.n. 9. Clearly, a juvenile's amenability to treatment plays a large part in the effect of proper placement and rehabilitation or punishment of the juveniles.
As neither this court nor the Legislature has set forth comprehensive guidelines for determining "amenability to treatment," we are permitted to look to the definitions offered by other states which have adopted the Uniform Juvenile Court Act. NDCC § 1-02-13.
The Pennsylvania Legislature has chosen to codify a number of factors courts are to consider when determining amenability to treatment under its version of the Uniform Juvenile Court Act. 42 Pa.C.S.A. § 6355(a)(4)(iii)(A) states:
"That the child is not amenable to treatment, supervision or rehabilitation as a juvenile through available facilities, even though there may not have been a prior adjudication of delinquency. In determining this the court shall consider the following factors:
 Age.
 Mental capacity.
 Maturity.
 The degree of criminal sophistication exhibited by the child.
 Previous record, if any.
 The nature and extent of any prior delinquent history, including the success or failure of any previous attempts by the Juvenile Court to rehabilitate the child.
 Whether the child can be rehabilitated prior to the expiration of the Juvenile Court jurisdiction.
 Probation or institutional reports, if any.
 The nature and circumstances of the acts for which the transfer is sought.
 Any other relevant factors."
In keeping with the due process requirements afforded to juveniles by Kent v. United States, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966), the Pennsylvania Courts have interpreted "amenable to treatment" as meaning:
"[T]he determinative factors in deciding whether the youth is amenable to juvenile treatment will differ from case to case. Such determination should be made after careful review of the individual child's personal make-up, (e.g., mental capacity and maturity as determined by consideration of his home and school environmental situation, emotional attitude, and pattern of living) his previous history (including any previous contact with law enforcement agencies and/or juvenile courts) and the nature and circumstances of the alleged homicide (e.g., inquiry into whether the killing was committed in an aggressive, violent or willful manner, whether the safety of the community requires lengthy incarceration, whether it is more desirable to dispose of the entire offense in one court should the juvenile's associates in the alleged homicide be adults not within juvenile jurisdiction)."
Commonwealth v. Pyle, 462 Pa. 613, 342 A.2d 101, 106-107 (1975). See also Commonwealth v. Cessna, 371 Pa.Super. 89, *686 537 A.2d 834 (1988); Commonwealth v. Zoller, 345 Pa.Super. 350, 498 A.2d 436 (1985).
Although Georgia, unlike Pennsylvania, has not defined "amenable to treatment," by statute[10] its case law has set forth guidelines regarding the determination of amenability under its version of the Uniform Juvenile Court Act.[11]State v. M.M., 259 Ga. 637, 386 S.E.2d 35 (1989) held that a juvenile's amenability to treatment in the juvenile system is subsumed under the concept of the "interest of the child." The "interest of the child" is weighed against the "interest of the community" while taking into account the potential effectiveness of the treatment, the child's prior record and previous experience with the juvenile system, and the psychological reports. See also In Interest of E.M., 198 Ga.App. 729, 402 S.E.2d 751 (1991); In Interest of J.J.S., 246 Ga. 617, 272 S.E.2d 294 (1980).[12]
Both implicit and explicit in the above definitions of "amenable to treatment" offered by other states is the significance of the juvenile's age. Although a juvenile is thought to be more apt and receptive to change and treatment than adult offenders, the juvenile justice system in North Dakota permits a limited amount of time for treatment under the system. In this case, M.D.N. is fifteen years old. If he is found guilty of the charges in either the juvenile or adult systems, he will be sent to the North Dakota Industrial School. NDCC §§ 12-46-13, 27-20-31. If convicted in adult court, once he reaches sixteen, he may be transferred to an adult institution after a hearing, and when he reaches eighteen, he must be transferred to an adult institution for the remainder of his sentence. NDCC § 12-46-13. If he is sentenced under the adult system, he will serve the remainder of his sentence in an adult penitentiary. Under the juvenile system, however, an order of disposition committing a juvenile to the State Industrial School continues in force only for two *687 years, with maximum allowable extensions of two years. NDCC § 27-30-36(2). Significantly, a juvenile disposition order can only continue until he reaches twenty, at which time he must be released from all obligation and control. NDCC § 27-20-36(6), State ex rel. Stensby v. McClelland, 58 N.D. 365, 226 N.W. 540 (1929). Therefore, if M.D.N. is found delinquent within the juvenile system, he will be released in a maximum of five years.[13]
Recognizing the presumption for the need for treatment as specified in section 27-20-29(2), NDCC, we are concerned about the likelihood that M.D.N. can be fully rehabilitated within the five year time period. Other states which have adopted the Uniform Juvenile Court Act have recognized that if the child cannot be fully rehabilitated within the allowable time period, he is not "amenable to treatment." Commonwealth v. Leatherbury, 390 Pa.Super. 558, 568 A.2d 1313 (1990); In Interest of T.M., 195 Ga.App. 342, 393 S.E.2d 448 (1990); In re K.S.J., 258 Ga. 52, 365 S.E.2d 820 (1988) [transfer to adult court not error if shown an insufficient time within juvenile system to insure optimal possibility of successful rehabilitation]; Commonwealth v. Zoller, 345 Pa.Super. 350, 498 A.2d 436, 439 (1985) ["... there was not sufficient time within the maximum available under juvenile court jurisdiction (five years until his twenty-first birthday) to assure rehabilitation and to protect society"]; Commonwealth v. Waters, 334 Pa.Super. 513, 483 A.2d 855 (1984); Commonwealth v. Sourbeer, 492 Pa. 17, 422 A.2d 116 (1980) [transfer properly denied where it was demonstrated that defendant could not be rehabilitated within time constraints of juvenile jurisdiction].
Determining whether a juvenile is amenable to treatment, especially in light of a limited time period within the juvenile system, requires the juvenile court judge to predict the future. It is essential, therefore, that the court hear expert testimonynot as a sole basis for the court's decision, but to assist in its determination. See Berg v. Berg, 490 N.W.2d 487 (N.D.1992) [VandeWalle, J., concurring]. The testimony by the four experts at the hearing presents only minimal and superficial evidence that M.D.N. can be fully rehabilitated within five yearsso minimal that in our de novo review, giving appreciable weight to the findings of the court, there are no reasonable grounds to believe that M.D.N. can be rehabilitated in that time with any reasonable probability.
David McGeary, the juvenile court supervisor for the South Central Judicial District, testified that M.D.N. would not be amenable to treatment as a juvenile based on his accountability and the limited time in which he would be under juvenile court supervision. McGeary testified regarding his contact with M.D.N. and his father and recalled M.D.N.'s past behavior during contact with five professionals in that M.D.N. did not respond, talk, or address his problem. McGeary also believed that the seriousness of the offense was an overriding factor in that it directly relates to M.D.N.'s pattern of behavior which is relevant to his motivation for treatment. In McGeary's opinion, due to M.D.N.'s past involvement and non-receptiveness to counseling and the seriousness of the offense, M.D.N. is not amenable to treatment within the juvenile system.
Karl Ulrich, a psychiatrist at the North Dakota State Hospital, testified that in his experience the chance of a successful treatment depends greatly on the cooperation and motivation of the patient. Dr. Ulrich related tests and observations made by his colleague, Dr. Ismir, which indicated that M.D.N. is guarded and is not apt to open up to psychological treatment. Dr. Ulrich himself questioned M.D.N.'s motivation, cooperation, *688 and capacity for treatment and diagnosis. Although Dr. Ulrich testified that there was a possibility that there would be sufficient time for treatment or rehabilitation in the juvenile system, this opinion was based on M.D.N. telling Dr. Ulrich that he did not commit the murders. If M.D.N. would admit to the murders or actually committed them, Dr. Ulrich's opinion of M.D.N.'s amenability to treatment would decline. Dr. Ulrich testified that when M.D.N. did cooperate, he gave very guarded answers. This, and the fact that M.D.N. indicated that he would commit suicide if he was to be tried as an adult, implies that M.D.N. consciously employs manipulative tactics for self-preservation purposes.
Conrad Dvorak, the Superintendent of the State Industrial School, testified that there were two main factors in the treatment and rehabilitation of juveniles: the time available for treatment and their receptiveness to the treatment. Mr. Dvorak could not testify that M.D.N. would in fact be amenable to treatment in his facility or successfully treated within the five-year maximum sentence under the juvenile laws. Dvorak's testimony also casts doubt on the lack of security and the availability of appropriate treatment programs and facilities at the State Industrial School, notwithstanding M.D.N. would apparently be at that institution until age 18 if determined to be delinquent in juvenile court.
Al Lick, Director of Juvenile Services for the State of North Dakota, testified that the five-year maximum sentence in the juvenile system would be a likely length of time to indicate whether or not M.D.N. was "headed in the right direction." Lick also testified that there had never been a juvenile convicted of similar crimes at M.D.N.'s age in the State Industrial School, although those younger than M.D.N. convicted of similar crimes were successfully treated owing partially to the increased length of time they were under the school's supervision.
Legislation that focuses on amenability to treatment includes an assumption that there are effective treatment programs for at least some serious or persistent delinquent juveniles, that clinical tools exist with which to diagnose the youth's treatment potential, and that judges can differentiate among various juveniles. This is emphasized in this case because of the restrictions placed upon the length of time a juvenile may remain under the control and management of the juvenile system. The testimony at the trial court of the past history of M.D.N.'s problems with attempts at counseling, the seriousness of his charged offenses, and, despite a juvenile's general greater receptiveness to change than adults, the limited length of time available for treatment in the juvenile system, supports the conclusion that M.D.N. is not amenable to treatment. The substantive evidence does not support a finding that there are reasonable grounds to believe that M.D.N. would be amenable to treatment within five years.
No evidence was presented as to the cause of the alleged murders or evidence dealing with M.D.N.'s motives or the reasoning behind them. The State tried to elucidate the relationship M.D.N. had with his family. Conflicting evidence was presented which indicated at once a positive and a negative relationship between M.D.N. and his parents. M.D.N. was said to have negative feelings toward his mother, positive ones for his father, and a fair amount of rivalry with his siblings. It was also revealed that M.D.N.'s father had a bad temper and at times physically abused him. There was also testimony that M.D.N. was misbehaving at home and had tried to run away.
Because of the seriousness of the offenses, murders, for the commission of which section 27-20-29(2), NDCC, presumes a need for treatment, the lack of evidence as to the nature of the treatment required severely complicates a determination of amenability to treatment. Nevertheless, the nature of the offenses makes us unwilling to assume, without additional evidence, that the need is only to heal a minor aberrational defect or that such treatment can be successfully completed within the few years remaining before M.D.N. would be released into society.
If, however, additional evidence exists concerning M.D.N.'s particular problems *689 and his amenability to treatment for those problems, he may request the juvenile court for a further evidentiary hearing to review its order transferring jurisdiction of the offenses, notwithstanding this opinion. On this record, we conclude that the state has met its burden of persuasion that M.D.N. is not amenable to treatment within the meaning of section 27-20-34(1)(b)(4)(b), NDCC. The order of the juvenile court is affirmed.
ERICKSTAD, C.J., and JOHNSON and MESCHKE, JJ., concur.
LEVINE, Justice, concurring in the result.
In North Dakota, it is the rehabilitation of children, not their punishment, that the legislature has ordained. That being the case, our efforts should be directed toward realizing that rehabilitative goal with all the means at our disposal. In Interest of R.R., 305 N.W.2d 38, 45 (N.D.1981) (Vande-Walle, J., and Paulson, J., dissenting). The majority opinion, faithful to the legislature's commitment to the rehabilitation of all delinquent children, provides a chance for M.D.N. to request reconsideration of the transfer order based upon additional evidence. With that act of grace, I heartily concur. I also concur in the result.
I knew it was trouble when the State and the child relied upon the same expert testimony in support of their respective positions. The moral of this case, from the child's point of view, is to secure an expert witness who, like Dr. Ulrich, will study, evaluate and visit with the child enough to offer the essential answers to several critical questions but who, unlike Dr. Ulrich, is sufficiently informed on the requirements of NDCC § 27-20-34(1)(b)(4)(b) and on the essential components of the opinion he must give in order for the child to prevail. Here, Dr. Ulrich answered some of the essential questions, but not all. That failure allowed the State to meet its rather flimsy burden of establishing probable cause that the child is not amenable to treatment as a juvenile.
As part of my de novo review of the juvenile court record, I believe Dr. Ulrich's testimony established that, assuming M.D.N. committed the alleged crimes, he suffered from a "severe conduct disorder," which was treatable at a juvenile facility. However, the doctor could not and, indeed, did not give us even an estimate of the likely duration of that treatment. So, none of us knows, even at this writing, whether there is any probability that M.D.N. could be successfully treated (or rehabilitated) in the five years remaining until his twentieth birthday. See NDCC §§ 27-20-34(1)(b)(4)(b); 27-20-36(2) and (6). The question arises then, whether that failure of proof should fell the State, which has the burden of establishing probable cause that M.D.N. is not amenable to treatment or rehabilitation as a juvenile. But, when a fifteen-year-old child allegedly commits four bloody murders, but is treatable for a severe conduct disorder, the crucial question is whether there are reasonable grounds to believe that treatment will be necessary for a period longer than five years. Given the lack of explanation for the commission of the crimes, the severity and gruesomeness of the crimes and the concern for public safety, I, too, conclude that reasonable persons are warranted in believing that treatment for longer than five years is required. See Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).
I believe Dr. Ulrich's opinion is the key piece of evidence here because I give no weight to Juvenile Supervisor McGeary's opinion that M.D.N. should be tried as an adult. McGeary would transfer all children fourteen or over (indeed, younger, if only allowed by the legislature) who are accused of committing murder. But, our legislature has not removed or excluded violent offenders from juvenile court jurisdiction. Instead, it has only authorized transfer of those juveniles in individual cases where it is shown that that fourteen- or fifteen-year-old child is not amenable to treatment or rehabilitation as a juvenile in an available facility. Unlike New York, North Dakota does not make the commission of homicide by a child thirteen or older automatically a matter for the adult criminal court. See N.Y.Crim.Pro.Law §§ 1.20(42) (McKinney *690 1992), 180.75 (McKinney 1982 and Supp.1993). Consequently, Mr. McGeary's opinion that all children who are accused of murder belong in adult court so that they can be held accountable for the appropriate length of time, is contrary to the express language of our statute, let alone its spirit. I do, however, give weight to the eyewitness portion of his testimony, derived from an hour-plus interview with M.D.N. and his father, describing the demeanor of the child but I have some doubt over the accuracy of the information given to McGeary by M.D.N.'s father. M.D.N.'s family had recently undergone family therapy because of the behavior of one of M.D.N.'s siblings and not, as related to McGeary, because of M.D.N.'s behavior. A small point, perhaps, but noted.
As for the testimony of Al Lick, the Director of Juvenile Services for the State of North Dakota, and Conrad Dvorak, the Superintendent of the State Industrial School, their opinions would have carried far more weight had they met and interviewed M.D.N. As it is, they knew nothing about him except what they had read in the newspapers and what they had derived from Dr. Ulrich's report shortly before the hearing. But, for me, their testimony, in particular, the testimony of Mr. Lick, resoundingly brought home the point that North Dakota has the will and the means to offer children who are violent offenders, a facility that would securely house them, competently treat them and diligently rehabilitate them. While it may offer small solace to M.D.N., that declaration stands as a beacon for those troubled children who inevitably will follow. Lick's testimony dramatically distinguishes this case from In re P.W.N., 301 N.W.2d 636 (N.D.1981). There, a juvenile court official testified that "there is no juvenile institution in our state that is capable of providing an adequate treatment and rehabilitation program coupled with the responsibility to protect the community and public at large." Id. at 642. Happily, Mr. Lick's testimony makes clear the progress we are making in providing services for a wider range of troubled children. Compare Eastburn v. J.K.H., 392 N.W.2d 406 (N.D.1986) [no available programs for child with behavioral problems who is slow learner in need of treatment so child is transferred to adult court].
Because Dr. Ulrich's testimony did not clarify the duration of necessary treatment and was, in many respects, ambiguous and generalized enough to give aid and comfort to both sides, and because many of his statements were so qualified by disclaimers and disavowals to cast shadows rather than light, the State was able to fulfill its burden. Because the issue of amenability to treatment was not successfully proved in favor of the child, the testimony of the rehabilitation experts, Lick and Dvorak, on the issues of rehabilitation and the availability of a facility, was less crucial but, nonetheless, telling.
It is our law, like it or not, that "probable cause" is all the State is required to establish in a transfer proceeding and not a preponderance of evidence or clear and convincing evidence. In Interest of A.D.L., 301 N.W.2d 380 (N.D.1981). If there is a rehearing, M.D.N. will have to give the juvenile court judge and us more information than was forthcoming in this proceeding.
NOTES
[1] Chapter 27-20 is North Dakota's codification of the Uniform Juvenile Court Act. Section 27-20-34, NDCC, reads in part:

"1. After a petition has been filed alleging delinquency based on conduct which is designated a crime or public offense under the laws, including local ordinances or resolutions of this state, the court before hearing the petition on its merits may transfer the offense for prosecution to the appropriate court having jurisdiction of the offense if:
a. The child is over sixteen or more years of age and requests the transfer; or
b. (1) The child was fourteen or more years of age at the time of the alleged conduct;
(2) A hearing on whether the transfer should be made is held in conformity with sections 27-20-24, 27-20-26, and 27-20-27;
(3) Notice in writing of the time, place, and purpose of the hearing is given to the child and his parents, guardian, or other custodian at least three days before the hearing; and
(4) The court finds that there are reasonable grounds to believe that:
(a) The child committed the delinquent act alleged;
(b) The child is not amenable to treatment or rehabilitation as a juvenile through available programs;
(c) The child is not treatable in an institution for the mentally retarded or mentally ill;
(d) The interests of the community require that the child be placed under legal restraint or discipline; and
(e) If the child is fourteen or fifteen years old, the child committed a delinquent act involving the infliction or threat of serious bodily harm."
[2] There is no serious dispute that there are reasonable grounds to believe that M.D.N. committed the delinquent acts alleged, that the acts involved the infliction or threat of serious bodily harm, or that the interests of the community required that M.D.N. be placed under legal restraint or discipline. Similarly, although an expert testified that M.D.N. suffered from a "mild conduct disorder," there is, in this record, no evidence to indicate that he is in need of treatment in an institution for the mentally ill.
[3] Jeffrey Fagen & Elizabeth Piper Deschenes, Determinants of Judicial Waiver Decisions for Violent Juvenile Offenders, 81 J.Crim.L. Criminology 314 (1990).
[4] Donna M. Bishop & Charles E. Frazier, Transfer of Juveniles To Criminal Court: A Case Study and Analysis of Prosecutorial Waiver, 5 Notre Dame J.L. Ethics & Pub. Pol'y 281 (1991). A 1987 study of prisons in four metropolitan areas found that youths in adult prisons were five times more likely to be sexually assaulted than those in a juvenile program, twice as likely to be beaten by guards, and weapon attacks were 50% more common. Youth's greater exposure to violence in prison may mean that they will become more violent themselves. Paul Marcotte, Criminal Kids, 76-APR A.B.A.J. 61 (1990).
[5] The Uniform Juvenile Court Act has been adopted by three states: North Dakota, Georgia (O.C.G.A. §§ 15-11-1 et seq.), and Pennsylvania (42 Pa.C.S.A. §§ 6301 et seq.). Pursuant to section 1-02-13, NDCC, in keeping with uniformity, we cite to these states' interpretations of the Uniform Juvenile Court Act for guidance in this case.
[6] Probable cause exists where the facts and circumstances are within the officers' knowledge and where they have reasonably trustworthy information which is sufficient in itself to warrant a person of reasonable caution in the belief that an offense has been or is being committed. Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).
[7] Since the statute requires the state to show "reasonable grounds," there must be testimony as to the amenability-to-treatment possibilities or the absence thereof in the record to meet the due process requirements granted to juveniles by Kent v. United States, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966). In order for an appellate court to determine if the State has carried the burden of proving that the child is not amenable to treatment, there must be evidence in the record for consideration in the appellate court. The transfer order must realistically reflect why the child is not amenable to treatment as a juvenile. Such a decision must be based on evidence, and the basis for it must be clearly reflected in the transfer order itself. C.L.A. v. State, 137 Ga.App. 511, 224 S.E.2d 491 (1976); J.J. v. State, 135 Ga.App. 660, 218 S.E.2d 668 (1975).
[8] In Juvenile Courts, the law assumes, in absence of evidence to the contrary, that the commission of acts which constitute felonies are sufficient to sustain a finding that the child is in need of treatment. NDCC § 27-20-29(2).
[9] Michael Vitiello, Reconsidering Rehabilitation, 65 Tul.L.Rev. 1011 (1991).
[10] The relevant Georgia statute, section 15-11-39(a)(3), O.C.G.A., reads:

"The court in its discretion determines there are reasonable grounds to believe that:
(A) The child committed the delinquent act alleged;
(B) The child is not committable to an institution for the mentally retarded or mentally ill; and
(C) The interests of the child and the community require that the child be placed under legal restraint and the transfer be made...."
[11] Despite no mention in the statute of the term "amenable to treatment," the Georgia Supreme Court has held that it:

"`continues to subsume "the juvenile's amenability to treatment within the concept, `the interest of the child,' and authorizes a juvenile court to transfer to the superior court a juvenile who is amenable to treatment if the juvenile court finds that the amenability factor is outweighed by the interests of the community in processing the child as an adult." In the Interest of J.J.S., 246 Ga. 617, 618(1) (272 S.E.2d 294 (1980)' In re E.W., supra, 256 Ga. [681] at 682, 353 S.E.2d 175."
State v. M.M., 259 Ga. 637, 386 S.E.2d 35, 37 (1989). Therefore, Georgia's interpretation of "amenability to treatment" within the scope of the Uniform Juvenile Court Act is relevant, notwithstanding the term is not used in the Georgia statute.
[12] States which have not adopted the Uniform Juvenile Court Act can also provide assistance in determining the definition of "amenable to treatment." A California Appellate Court held that:

"A person is amenable to ... treatment if he can be materially benefited. A person will be materially benefited when there is a reasonable possibility his likelihood to commit criminal behavior can be significantly reduced or eliminated within the available confinement and jurisdiction time. These factors are considered in determining whether a person will be materially benefited: (1) Does the person have the capacity to change? (2) Is the person's criminal behavior so firmly established there is little likelihood it can be changed by CYA [California Youth Authority] commitment? A person will also be materially benefited when there is a reasonable possibility his criminal behavior would be exacerbated more by the other disposition alternatives available to the court when compared with disposition alternatives available to the CYA."
People v. Gonzales, 186 Cal.App.3d 591, 230 Cal.Rptr. 732, 734 (1986). In a similar scenario, Connecticut has interpreted the term "amenable to reformatory methods," as meaning "[a] person is amenable to reformatory methods when, in the opinion of the trial court, he is found to be a person who will yield and submit to reform and it is reasonably probable that he will be reformed as a result of his being an inmate in the reformatory." State v. Nacsin, 23 Conn.Supp. 214, 180 A.2d 643, 646 (1962).
[13] Section 27-20-36, NDCC, states that "[t]he court which made the order may extend its duration for additional two-year periods subject to like discharge...." This envisions that a juvenile order may be extended for more than one two-year period. The Uniform Act section 36 and Georgia statute section 15-11-41(a), O.C.G.A., seem to only envision a single two-year extension by stating that "[t]he court which made the order may extend its duration for an additional two years subject to like discharge...." [Emphasis added]. See also 42 Pa.C.S.A. § 6353(a).